UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:22-cr-17 (TFH)** |
| v. | : | |
| | : | |
| JOHN M. CAMERON, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant John Cameron to 30 days of imprisonment, a 36-month term of probation,[1] 60 hours of community service, and $500 restitution.

## I.      Introduction

Defendant John Cameron, a 55-year old real estate broker from Port Orchard, Washington, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the

---

[1] A period of probation after a term of incarceration (or "split sentence") would be appropriate in the defendant's case. The general prohibition against sentences that combine continuous incarceration and a term of probation, *see* 18 U.S.C. § 3551(b), does not apply where, as here, the defendant is sentenced for a petty offense, *see* 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009). Mindful of the Court's prior rulings in similar cases, the government refers to and incorporates its briefing submitted in *United States v. Weisbecker*, 21-cr-682 (TFH), Government's Sentencing Memorandum, Dkt. 31, at 28-36, rather than re-raising the same arguments here.

In the alternative, a sentence of probation may include intermittent incarceration or a shorter period of incarceration as a condition of probation. *Id.* at 36-38.

peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[2]

Defendant Cameron pleaded guilty to one count of Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 30 days of imprisonment is appropriate in this case because the defendant (1) raised money from his social media followers and readers to fly across the country to the rally and post about his experience there; (2) upon entering the restricted West Lawn of the Capitol grounds, observed rioters scaling walls to reach the building and posted live video of the scene to his Twitter account, noting that rioters were causing damage; (3) after witnessing the damage, pressed forward to the Upper West Terrace where he posted video just outside the damaged Capitol doors and commented to his followers, "we can all judge, whether this is illegal or not"; (4) entered the Capitol just 10 minutes after it was first breached through a door with sirens blaring and broken glass on the floor; (5) filmed and photographed rioters taking over sensitive office space and officers deploying "tear gas" inside the Capitol building during the approximately 20 minutes he was inside; (6) remained on restricted grounds for another hour after he reported to his wife that he had been "kicked out" of the building and "tear gassed"; (7) posted a self-narrated video to his Facebook account that afternoon describing the deadly riot to his followers as a "fun, exciting, interesting, historic event"; (8) continues to blame "the weaponized politicized double standard of justice" for his prosecution; (9) portrays himself as a political prisoner to gain social media followers; and (10) solicits

---

[2] Although the Statement of Offense in this matter reflects a sum of more than $1.4 million dollars for repairs (ECF No. 27 at ¶ 6), as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

thousands of dollars in donations for his "legal defense fund," without explaining that he has pleaded guilty.

The Court must also consider that Cameron's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building and disruption of the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach of the Capitol; threatened the lives of police officers, legislators and their staffs; and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts and circumstances of Cameron's crime demand a sentence that includes a period of incarceration.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 27 (Statement of Offense). A riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Cameron's conduct and behavior surrounding January 6.

*Defendant John Cameron's Role in the January 6, 2021 Attack on the Capitol*

John Cameron, a real estate broker and small business owner from Port Orchard, Washington, began making plans to travel to D.C. in protest of the transfer of power as early as December 2020. On December 20, 2020, he posted to his Facebook page, "I will be in DC Jan. 6th. Any other Patriots making the Trip?" The post received 120 comments and one share. By January 4, 2021, he had acquired a "MAGA hat" for the occasion and was packing for his trip to DC. This post, shown below, received 451 views:



*Excerpt from Cameron's public Facebook account*

As Cameron admitted in his Statement of Facts before this Court, the purpose of his trip was not only to prevent or protest Congress's certification of the vote count of the Electoral College, but also to post about his experience on social media for his "readers/followers," some of whom offered to help fund his trip. The night before he left, he messaged his wife, "Had 5 more people

offer to help fund my trip…lol[.]" She replied, "you should just set up a little cashapp link that stays on the description part of your page… people will donate just to keep you writing[.]"

Cameron arrived in DC in the evening of January 5. That day, he posted to his Twitter account, "PATRIOT Party in DC. Trump March with all of us MAGA supporters. Protest against the steal and support election integrity. #StopTheSteal." Early the next morning, he shared with his followers pictures of his preparations for a day out in the cold:



*Excerpt from Cameron's public Facebook account*

Cameron went to the "Stop the Steal" rally near the White House that morning, then marched with other protestors to the U.S. Capitol. At around 1:53 pm, he sent a Facebook message to his wife, "heading to capitol building[.]" He made his way into restricted grounds on the West Lawn. There, he observed individuals scaling the walls to reach the Upper West Terrace, and he filmed as rioters breached further into the restricted area. Video recovered from Cameron's Facebook account shows rioters using stolen police bike rack barriers as ladders to climb up to the Upper West Terrace. *See* Exhibit 1 (video from Cameron Facebook account). At the start of the video, Cameron can be heard yelling, "I'm going. Come on!" *Id.* at timecode 0:25. He added, "I know I'm old, but, it's time."



*Excerpt of video found in Cameron's public Facebook records; full video at Exhibit 1*

Cameron followed the mob up the stairs, advancing closer to the besieged building. As he climbed stairs that had been breached just minutes before, Cameron filmed the scene around him. He posted video to his Twitter account with the comment, "No violence, but some damage." *See* Exhibit 2. Agents recovered this video from Cameron's public Twitter page:



*Excerpt from Cameron's public Twitter account; full video at Exhibit 2*

In fact—contrary to what Cameron reported to his followers—a great deal of chaos and violence surrounded Cameron as he advanced forward through the West Lawn and the West Plaza around 2:00 pm. A number of clear signs and warnings alerted Cameron and his fellow rioters that they were not authorized to even enter the grounds. The outer perimeter of the Capitol Grounds, made up of metal bike rack barriers, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" But the mob nevertheless jumped over and pushed down the unmanned barricades and advanced into the restricted area to engage with and overrun the outnumbered U.S. Capitol Police officers.

By around 1:00 pm, rioters overwhelmed the second manned police barrier protecting the West Plaza and Northwest Lawn. It then took the crowd less than a minute to push through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers faced off with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site. This battleground was a chilling scene, and impossible for anyone in the area to miss.

At 2:03 pm, as Cameron would have been making his way through the West Front, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

8

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles. Cameron advanced up the stairs through this scene, arriving at the broken Senate Wing Door of the Upper West Terrace just ten minutes after it was first breached.

As he reached the doors, Cameron filmed and narrated what he saw. *See* Exhibit 3. This video was not available on Cameron's public Facebook page months after the riot, but agents recovered the footage from Facebook through a search warrant. In one video, which appears to be taken around 2:15 pm, the crowd chanted "USA! USA!" and fought to gain entry through the Senate Wing Door. A small group of riot police officers looked on, attempting to secure an entry that had not yet been breached.



*Excerpt of video found in search of Cameron's Facebook records; full video at Exhibit 3*

Cameron indicated he was pleased with the events, stating to the camera, for the benefit of his social media followers:

To give you an indication of how important millions of people in the country think election integrity is, civil disobedience has kicked in, and they are doing what they think is right to get attention on the subject. So you can judge, we all can judge, whether this is illegal or not, but if this is what it takes to be heard, because our votes aren't, then this is what happens.



*Excerpt of video found in search of Cameron's Facebook records; full video at Exhibit 3*

*Id.* (informal transcript prepared by counsel). By posing the question "whether this is illegal or not," Cameron indicated his understanding that he was indeed engaged in illegal acts, even before entering the building, which he did just a few moments later.

Just yards away, at around the same time, the Capitol had been first breached by rioters who broke the windows next to the Senate Wing Door and jumped through the broken glass:



*Excerpt from U.S. Capitol Closed-Circuit Video*

Cameron was just ten minutes behind the very first rioters to breach the building. He was near the forefront of the siege of the U.S. Capitol. At 2:23 pm, Cameron walked through the doors as others jumped through the windows on either side. Loud, high-pitched, continuous alarms, similar to fire alarms, were sounding as they entered. Cameron entered, holding up his cell phone in what appears to be an effort to document the experience:





*Excerpt and close-up from U.S. Capitol Closed-Circuit Video; Cameron circled in yellow*

No police officers can be seen in the area—likely because the police were overwhelmed and deployed to critical locations that required additional protections. No one entering through these doors at that time could possibly have mistaken that they were unwelcome, advancing into what should have been a secure government building that had been overrun by a violent mob willing to break windows and doors to gain unlawful access.

Video recovered from the search of Cameron's private Facebook records shows that he filmed a portion of his march through the Capitol after he entered. *See* Exhibits 4, 5. After breaking into the building with his fellow rioters, Cameron turned south. Rioters chanted, and one yelled, "it's not over!" Cameron walked into a conference room, Room S145, where he saw rioters standing on the windowsill, putting their shoes up on the couch, and generally taking over.



*Excerpt of video found in search of Cameron's Facebook records; full video at Exhibit 4*

Cameron then advanced to the Crypt, which had been taken over by rioters in the minutes before he arrived. He joined a large mob chanting, "Stop the Steal" and attempting to push through to access the rest of the building. A cry of "Whose house? Our house!" rang out in unison.



*Excerpt of video found in search of Cameron's Facebook records; full video at Exhibit 4*

At around 2:30 pm, while Cameron was inside the building, he messaged his wife, "The Capitol building got stormed." Cameron's message used the passive voice, omitting any acknowledgement that he himself was part of the mob that did the storming. When his wife asked, "how is that affecting where you are?" Cameron answered, "I haven't seen anything violent. I'm inside[.]" When she asked how that was possible, he minimized the destruction he had experienced in his effort to get there, claiming, "Everyone just walked in[.]" Then at around 2:36 pm, he sent a message to a group of Facebook friends, "I'm inside[,]" along with a photo to prove it.

Cameron continued filming and photographing his journey through the Capitol building. In one video Cameron filmed, clouds of pepper spray can be seen in the air as alarms sounded in the background. *See* Exhibit 5. Cameron walked through the halls as fellow rioters covered their faces from the gas. Police ushered him out through the broken window near the Senate Wing Door at approximately 2:42 pm.



*Excerpts of video found in search of Cameron's Facebook records; full video at Exhibit 5*

14



*Excerpt and close-up from U.S. Capitol Closed-Circuit Video; Cameron circled in yellow*

When Cameron left the building at 2:42 pm, a Facebook message from his wife awaited him, asking, "are they allowing you to stay in there?" Cameron answered, at 2:47 pm, "Got kicked out and tear gassed[.]" To a Facebook follower who cheered him on with the note, "Cspan says capital is under siege. You GO PATRIOTS!!!!!!![,]" Cameron responded with a photo of a smoky interior hallway in the Capitol, and the note, "Tear gas[.]" But despite being tear gassed, Cameron did not leave the area. He stayed close to the building for another hour or so. During this time, his wife encouraged him to "keep posting" to his social media accounts because "[t]he news stations and social media is going nuts right now[.]" Cameron did in fact continue documenting the scene, and narrating what he saw there, but he was cautious with his words. In one video recovered from his public Facebook account, Cameron carefully concealed the fact that he himself had been inside the restricted building. *See* Exhibit 6. Cameron told his followers:

> So I'm taking a tour of the Capitol, Capitol building. We were on that side, where people went in. I'm not sure if they went in here. But it's mostly some verbal talking and just, stuff. It does appear or at least the last word was, or rumor, that antifa was here.

Exh. 6 (timecode 1:10) (informal transcript prepared by counsel). His narration was interrupted by loud chanting from the crowd, "Let us in!" The caption read, "Peaceful non violent. But antifa just showed up." There is no evidence to suggest Cameron saw any indication of antifa supporters at the riot.



*Screenshot of Cameron's public Facebook post; full video at Exhibit 6*

In his public social media posts that afternoon, Cameron uploaded videos and added more comments. At 3:49 pm, he wrote on Facebook, along with video of the riot:

> I saw no violence. Substantially, so far, WAY more peaceful than Antifa BLM burning, rioting pillaging. No police stopping protesters from entering. You can see there are a bunch blocking one door way. This is not to steal the election, as some are saying, its to stop the steal that already did happen.

Google location records indicate Cameron left the grounds at around 3:51 pm.

*Cameron's Statements After the Riot*

Shortly after he left the Capitol grounds, Cameron expressed trepidation about distributing videos and photos from inside the Capitol to a wider audience, demonstrating that he knew his conduct was illegal. He had initially shared at least one picture he took inside the building with a select group of people, but he soon reconsidered. In a private group message to his Facebook friends at 3:58 pm on January 6, just after he left the Capitol grounds, he said, "I'll have to consult my attorney before post anything more…lol[.]" Then he consulted his wife. In a private message around 4:04 pm, Cameron asked his wife, "Should [I post] the inside stuff[?]" She encouraged him to "post it all…people want to know what's really happening[.]" Cameron agreed. He wrote to the larger group at 4:10 pm, joking, "My atty said go for it check my page[.]" But by 5:16 pm, after discussing some of the news coverage with his wife—including his prediction that "I do believe it will get ugly soon"—Cameron reconsidered. He told his wife, "Not posting any of my interior stuff[.]" She told him she had found video showing Cameron, but that the only thing identifying him was the American flag he wore around his shoulders. She noted, "could be anyone[,]" and Cameron agreed he could maintain his anonymity: "There were many American flag capes[.]" Although his earlier message to friends suggests he had posted some of his "inside stuff" publicly, it appears he removed those photos and videos from public access; during their investigation, agents did not locate any of Cameron's interior pictures or video on his public social media profile. This shows that Cameron knew his participation in the riot, and specifically his role in breaking into and "storming the Capitol," was unlawful.

On his way home to his hotel room, Cameron posted more commentary about the day. In a video recovered from his public Facebook account, Cameron gave his version of events on

January 6. *See* Exhibit 7.



The least safe I felt was when walking back to catch train I was told to F U by a little antifa BLMer on a Vespa who was traveling the opposite direction.

*Excerpts of video found in search of Cameron's Facebook records; full video at Exhibit 7*

In this video, Cameron attempted to minimize and rationalize the events of January 6 and described his opinions and observations as follows:

> Well I just got done coming from the Capitol. Took the Red Line to my stop. I'm safe and sound. A lot of people are commenting on some of my video. I was obviously right there, saw everything. I didn't see any ambulances, if there was any shootings there were no ambulances, I didn't see anybody removed from the Capitol that was injured. I didn't even see a single punch thrown. I felt safe. I've

certainly felt much, I've certainly felt more in danger at, say, bars or crazy concerts where fights break out. I've been in a couple like riots in college at U. Mass, when it snows there there's big crazy snowball fights, there's a lot of destruction and vandalism.

So some of my opinion on some of what happened is that there's a lot of obviously division in the country, right wing, left wing… The left, also believing in what mainstream media tells them, the right doesn't. Also a lot of the right, conservatism, is silent and has remained so up to a certain point. And it appeared—has appeared that like, you know, antifa and BLM breaking and rioting and burning and looting has gotten more action that being silent. So, in my opinion, that's, you know, some guys, young guys in particular, took that to heart. I don't know who broke the doors down over at the Capitol building, I don't know any of that. **You know, was it pretty? No. Did it make a statement? Yes.**

A lot of people have like maybe even said that, I don't know, BLM and antifa burning, looting, pillaging businesses, is not as bad as that. There didn't appear to be a lot of damage. A couple of doors I saw did get kicked in, or whatever. But, yeah. Don't believe the media sensationalism. **I heard a couple people got shot, I don't know. I didn't see it. I was there, I didn't see any ambulances or any of that.** I left, I got cold, I'm old. Hungry, tired, I've been up since I don't know 4:00 this morning, two nights in a row.

So, what we really need in the country is unity. Half the country thinks the election was stolen—and I'm part of that half—by election fraud, voter fraud, constitutional violations, and voting machine issues. There's evidence, and lots of it. You can't go to CNN and find that evidence. You have to go elsewhere. We've seen it, we're not just believing in Trump telling us. If Biden was a true leader, and wanted unity, he would show up, have some real answers, try to get to the bottom of what's causing the division of this election, and that's the vote. There hasn't been—there's only been one court case where evidence was heard. There's been a lot of failures from the systems of government in the eyes of the right. And transparency in votes is and was and still will be needed.

And that's all I got. **But it was fun, exiting, interesting, historic event.** So, God bless America, and the President, and you.

Exh. 7 (emphasis added) (informal transcript prepared by counsel).

Later that evening, apparently from his hotel room, Cameron continued to send private messages about his role in storming the Capitol building, but only to those he trusted to keep it secret. Cameron's Facebook friend Andrew thanked him for "taking a stand for our country" at the riot and said Cameron's videos are "[t]he only ones I trust[.]" At around 9:19 pm, Cameron responded privately with videos from inside the building, but he added, "Keep these on the DL"—

that is, he instructed Andrew not to discuss or distribute them. Andrew promised, "I won't say a peep about them." Cameron also sent video to his Facebook friend Terry at around 11:34 pm and asked that Terry "Keep this on the DL too[.]" Cameron added, "I was right in it[.] So you know I know wtf was going on[.]"

That night, even after he had additional time to reflect and to view ongoing news coverage of the events, Cameron reported false information to his followers about what had happened. Around 9:25 pm, Cameron's Facebook friend Andrew asked, "What are your opinions on today? Good? Bad?" Cameron replied, "Staged…antifa led the way in. Pissed mob behind them. There were tons of cops and body armored dudes all over trumper would have moved along if asked." But Cameron knew the event was not "staged" or led by antifa. In fact, in a 4:24 pm private message to his wife, he said, "Antifa did not storm the Capitol" because, in his mind, "there's no merchandise to steal."

Cameron also expressed his desire to have done "more" on January 6, and he voiced support for the violence that did occur and potentially for additional violence. To his Facebook friend Robbie, who sent Cameron articles about a woman who was shot at the Capitol that afternoon, Cameron reported, at around 9:19 pm, "I did see the door with the bullet hole. But if she got shot thru the door thats on the cop. And we should burn and riot and loot over it." He added, "If I was younger I would have done more." He said he tried to get "as close as I can to the action[.]" On January 8, he replied to a comment by someone else regarding the attack on the Capitol, stating his view that "violence and rioting really doesn't help but does make a statement good or bad it is heard. Now its better to diffuse a situation slowly over time, but that hasn't happened." With this, Cameron indicated that he saw the violence as a necessary and therefore appropriate way to "make a statement."

*FBI Search, Charges, and Plea Agreement*

The FBI identified Cameron in U.S. Capitol Police surveillance footage and began investigating. They obtained a complaint charging him with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). They approached his home on December 16, 2021, with a search warrant in hand. When they arrived, Cameron told them he and his family were sick, so agents agreed not to execute the arrest out of respect and concern for Cameron's health. With Cameron's assistance, they located the items sought in the search warrant, including his cell phone and the clothing and flag that Cameron wore to the Capitol on January 6. Cameron declined to be interviewed that day.

The agents offered Cameron the opportunity to self-surrender at a later date, which, after coordinating with counsel, Cameron did on January 5, 2022. He was processed, brought to court, and released that same day. On January 13, 2022, he was charged by Information, and on March 29, 2022, by Superseding Information, alleging the same charges as the complaint.

On May 4, 2022, Cameron pleaded guilty to Count Four of the Superseding Information, charging a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Cameron agreed to pay $500 in restitution to the Department of the Treasury. At the change of plea hearing, sentencing was scheduled for August 15, 2022.

*Cameron's Recent Social Media Claims*

As Cameron's sentencing date approaches, he has taken to social media to gather support and raise money. According to his Twitter account "@johnrockshomes," he now has more than 2,300 followers.[3] On July 22, 2022, he responded to a tweet about a "January 6 political prisoner"

---

[3] It is unknown how many Twitter followers Cameron had on January 6, 2021. At the time, he also used Facebook, but it appears his Facebook account was deactivated. As noted above, Facebook records indicate that a post he made on January 4 in anticipation of his trip received 451 views.

who died in an apparent suicide. As shown below, Cameron responded that he had pleaded guilty to the same charge. He added, "The full weight of the weaponized politicized double standard of justice weighs heavily on my heart."



(Cameron had expressed similar sentiments before his guilty plea; for example, in a tweet on March 3, 2022, he stated, "I am grateful I've been released on my own recognizance, but feel guilty my fellow Patriots are being held as political prisoners in DC Gulag.")  In another recent tweet on July 23, 2022, Cameron downplayed the seriousness of his conduct by describing it as follows: "I wore a 'Count All Legal Votes.'. And chanted 'Stop the Steal.' That's the crime of illegal picketing." Similarly, on August 5, 2022, as shown below, he claimed that he was prosecuted simply for exercising his First Amendment rights:



These statements make clear that Cameron is not grasping the seriousness of his crime, or the consequences his actions have had on society.  He is broadcasting and celebrating his status as "a J6 defendant" or "political prisoner" and using it as an opportunity to raise money. On July 23, 2022, he posted the following plea for financial support for his "legal defense fund," with a picture of himself on January 6, highlighting the fact that he was "closing in on 2K followers."



In a similar post the same day, Cameron posted another picture of himself from January 6, and stated, "God bless the J6 defendants. The obstacles in my path aren't obstacles they are the path."

Again he asked for donations to his "legal defense fund." Cameron posted all this despite his recognition of the potential consequences before this Court: on another occasion on July 10, 2022, in response to a vulgar meme posted by another Twitter user, Cameron posted, "I would share this, but I'm a J6 defendant and have the Feds monitoring my account. Good one tho."

According to GiveSendGo, the service he used to raise money, Cameron has raised more than $5,300 for his "Dad Defends Democracy John Cameron J6 Defense Fund," which features a picture of Cameron and his minor son. In his pitch for donations, Cameron claims that he merely followed the crowd walking to the Capitol. He claims, "There was no violence, vandalism or destruction of property caused by or seen by John [Cameron] that day." Then he claims, "John still has a major legal battle ahead of him[.] … John needs the resources to make this an effective legal fight and conduct proper discovery. He is willing to push back and expose the truth." In his bid for money, Cameron does not mention that he has pleaded guilty before this Court and admitted his criminal conduct under oath and that no additional discovery would take place. Thus, just weeks before his sentencing hearing, Cameron is raising money by creating the false perception that he is a persecuted political prisoner fighting his case.

### III.    Statutory Penalties

Cameron now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days of imprisonment followed by 36 months of probation.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Cameron's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including:

(1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Cameron personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts is therefore not a mitigating factor in misdemeanor cases.

Cameron traveled to Washington specifically to prevent or protest Congress's certification of the vote count of the Electoral College and to broadcast his experiences with others on social media. He even encouraged his social media followers to pay for his trip in exchange for keeping them informed of what happened. After the rally that morning, he eagerly charged forward to the Capitol building. He fulfilled his promise and in fact posted the scenes he encountered on Facebook and Twitter. Upon approaching the battle scene on the West front, he celebrated, and posted video labeled, "Civil disobedience." From the very start, Cameron understood he was participating in something illegal, at the very least disobeying the police. He said, "it's time." Then he charged up the stairs to the Capitol doors.

Cameron often downplayed the violence and destruction to his followers and attempted to minimize the culpability of those who violently breached the Capitol. He acknowledged seeing "some damage," but claimed—implausibly, and repeatedly—not to have witnessed any violence.

This distortion of reality gave his followers a censored version of events that played into the narrative Cameron wanted his followers to believe. But it was not true—and Cameron, who in his words was "right in it" and therefore "I know wtf was going on"—knew it was not true. In fact, he even changed his reporting when later that night he claimed to one of his followers that the whole event had been "staged" by antifa agitators—a claim (as he had earlier conceded) he knew to be false.

Cameron was among the first to unlawfully enter the Capitol, entering the building approximately ten minutes after it was first breached at his location of entry. While no police officers were available on the scene to block his path, there were clear signs of violent entry. The window adjacent to the door through which Cameron passed had just been smashed. He walked directly past a pile of shattered glass on the ground as he moved deeper into the Capitol. He saw his fellow rioters standing on the furniture and putting their feet up on the couch in what was obviously a private conference room. The videos he took demonstrate that he heard the alarm sounding: a loud, high-pitched, continuous beeping, similar to a smoke alarm. *See* Exh. 5. He was aware that tear gas had been deployed—indeed, he walked through clouds of it and boasted about the experience. He left the Capitol only when police officers escorted him out, and he jumped through a broken window to do so. Yet he stayed on Capitol grounds for another hour, supporting the crowd and perhaps looking for another point of entry.

Cameron's actions after the riot indicate a total lack of remorse or even recognition of the consequences of his crime. He did not speak to law enforcement, but he did make additional social media statements in an effort to gain supporters and raise funds. In doing so, he has presented a false narrative of someone persecuted for his political beliefs, claiming he is a victim of injustice, bias, and a "weaponized" justice system. On his fundraising platform, which he advertised just

weeks before his sentencing hearing, Cameron misled his would-be donors by suggesting he disputes the allegations against him and will "fight" the charges. And even when he has acknowledged his guilty plea, he mischaracterized his conduct as frivolous and harmless: "I wore a 'Count All Legal Votes.'. And chanted 'Stop the Steal.' That's the crime of illegal picketing." But his actual conduct was far worse, and Cameron's sentence must hold him accountable. The nature and the circumstances of this offense establish the clear need for a sentence that includes a period of imprisonment.

### B.  The History and Characteristics of Cameron

As set forth in the PSR, Cameron is a real estate broker and business owner. He completed most of his college courses and has specialized training in commercial construction. He has owned several companies in the home construction industry. He has a stable family life and support system. This background makes Cameron's conduct on January 6, and his failure to recognize the dangers of his behavior, all the more troubling. As a respected member of his social circles, Cameron used his position to spread false information rather than accepting accountability for his behavior.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. As this court has stated, there should be no "presumption of probation" and instead "the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected." *United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. 7/19/2021, at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Cameron's consistent minimization and falsehoods about the riot and his own role in the events of January 6 demonstrate the need for specific deterrence for this defendant. He continues to downplay and ignore the seriousness of his conduct, showing no appreciation for the destruction and devastation it caused. Despite clear indications that he knows it is not true, he has insisted, even well after the fact, that the riot was peaceful, casting doubt on basic undisputable facts—including the many injuries and even the loss of several lives.

He used the riot as an opportunity to grow his influence on social media and even raise money. The sentence in this case should send a message to Cameron and others that a peaceful democratic society does not tolerate his behavior on that day. A sentence that includes incarceration will serve that important need.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

The government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Cameron based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Cameron convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Cameron has pleaded guilty to Count Four of the Superseding Information, charging him with Parading, Demonstrating, and Picketing in the Capitol building, in violation of 40 U.S.C.

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

§ 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. However, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch

of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in three cases provide suitable comparisons to the relevant sentencing considerations in this case:

In *United States v. Philip James Weisbecker*, 21-cr-682 (TFH), the defendant, like Cameron, followed the mob into the Capitol building after watching rioters climb the scaffolding outside. He entered through the same door at nearly the same minute as Cameron. Once inside, he took photographs and video. Like Cameron, Weisbecker posted photos and videos from the Capitol on his social media accounts, along with statements that demonstrated a lack of remorse even after the riot had ended. Cameron and Weibrecker both entered a sensitive area of the Capitol, and they both later minimized their conduct by later insisting they had done nothing wrong. Weisbecker was sentenced by this Court to 30 days of intermittent confinement as part of 36 months of probation.

In *United States v. Stephen Baker*, 21-cr-273 (TFH), the defendant was an aspiring right-wing media personality who, like Cameron, planned to broadcast what happened on January 6. Unlike Cameron, he approached the Capitol from the East Side, at the Rotunda doors, a scene less obviously violent than the West Front, where Cameron approached the Capitol and where rioters battled with police in hand-to-hand combat. But just as Cameron did on the other side of the building, Baker recorded video for his followers and expressed the same sentiments: he

approvingly reported, "I will never forget this." Baker was forced out after spending around an hour inside the building, longer than Cameron, but Baker (unlike Cameron) did not wander throughout the building. And Baker did not have later social media posts that celebrated himself as a "J6 defendant" or portrayed himself as a political prisoner to raise money and followers. Baker was sentenced to serve 9 days of intermittent confinement as part of 36 months of probation. A lengthier sentence is required here, due to the many more aggravating factors in Cameron's case.

In *United States v. Sorvisto*, 21-cr-321 (AJB), the defendant entered and exited the U.S. Capitol at nearly the same times as Cameron, through the same door (to enter) and window (to exit).  After the riot, the defendant, much like Cameron, took steps to conceal what he had done. When someone else posted pictures of Sorvisto in the Capitol, he texted that associate, "delete them dc pics." There is no evidence that Sorvisto later celebrated his participation in the riot or used it as an opportunity to raise money. The government requested, and the court imposed, a sentence of 30 days' imprisonment. Cameron's case warrants at least as serious punishment as Sorvisto's.

The sentences of home confinement imposed in *United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), do not dictate a similar result here. In that case, the government recommended sentences of home confinement for both husband and wife defendants (who were at the time of sentencing expecting a child). In doing so, the government "placed substantial weight in making our sentencing recommendation on the early acceptance of responsibility by the Bustles. I believe that they were the first defendants who were charged solely with misdemeanor offenses to plead guilty." Tr. 08/24/21 at 9. And they were among the very first to be sentenced. Further, unlike Cameron, the Bustles took themselves off social media and expressed sincere remorse for their behavior on January 6. In imposing sentence, this Court noted that the Bustles went to DC to

35

attend a medical protest, not to stop the certification of the election. *Id.* at 29-30. The Court also noted that the Bustles' case was unique, and different from most; in most other cases, "the people who engaged in this process should be punished and have to be responsible, and that may be jail time for most people." *Id.* at 30. Cameron's entry through the battle ground on the West Front, his celebration of the riot, his attempts to remove evidence of his crime and scrub his social media accounts, and his recent attempt to glorify his conduct, all put him in a very different category from these very early guilty pleas.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence defendant John Cameron to 30 days of imprisonment, 36 months of probation, 60 hours of community service, and $500 restitution.

Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing meaningful restrictions on his liberty as a consequence of his criminal acts.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ *Emily W. Allen*
         EMILY W. ALLEN, Cal. Bar No. 234961
         Assistant United States Attorney
         601 D Street, N.W.
         Washington, DC 20530
         emily.allen@usdoj.gov
         (907) 271-4724